**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X

KEVIN SUTTON and VINCENT DAVIS,

                                                    Plaintiffs,            **COMPLAINT**

        -against-

BROOKFIELD  PROPERTY  PARTNERS,  L.P;            **JURY TRIAL**
MULLIGAN  SECURITY  CORPORATION;  KIM
MERTZ-SHEA;   TOM   BURKE;   and   JOHN
POLITOSKI,

                                                    Defendants.

------------------------------------------------------------------ X

        Plaintiffs KEVIN SUTTON and VINCENT DAVIS, by their attorneys, Beldock Levine &

Hoffman LLP, as and for their complaint against the defendants alleges as follows:

## PRELIMINARY STATEMENT

        1.      This is an action seeking redress for defendants' racial discrimination and/or bias

under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Equal Employment

Opportunity Act of 1972 and the Civil Rights Act of 1991, 42 U.S.C. §2000-e *et seq.*, the Civil

Rights Act of 1871, as amended in 1991, 42 U.S.C. § 1981, New York State Human Rights Law

("State Human Rights Law"), N. Y. Exec. Law §290 *et seq.*, and the New York City Human Rights

Law ("City Human Rights Law"), 1 New York City Administrative Code 8-101 *et seq.* of the New

York City Administrative Code, as well as for unpaid wages under the New York State Labor Law

§ 190 *et seq.*

        2.      Plaintiffs Kevin Sutton and Vincent Davis were the only full-time African-

American Tactical Response Officers ("TROs") hired by Mulligan Security Corporation

("Mulligan") to be assigned to Brookfield Property Partners, L.P.'s lower Manhattan properties in

May 2015. During Mr. Sutton's and Mr. Davis's employment with Mulligan, they experienced

racially motivated discrimination and retaliation including: receiving the lowest holiday bonuses

of all full-time TROs assigned to Brookfield properties, as well as lower bonuses than many part-time, white TROs; being the target of racially discriminatory comments by coworkers; being repeatedly assigned to the least favorable security posts; and being the target of selectively enforced disciplinary policies. Mr. Sutton was retaliated against for sharing the contents of a text message in which defendant JOHN POLITOSKI, a white TRO team leader, wrote that he was going to set fire to a Latino security guard. Mr. Sutton was forced to resign his position when Mulligan Senior Executive members refused to allow him to continue working a Monday through Friday schedule, an accommodation made to several white TROs. Mr. Davis was terminated for conduct, despite the fact that his supervisor deemed punishment "unwarranted" and white and Latino coworkers were not even disciplined for the same actions.

3.      Plaintiffs seek redress for injuries they suffered when they were negligently, maliciously, recklessly, shockingly, outrageously, and unlawfully discriminated against because of their race.  Plaintiffs seek: (i) compensatory damages for pay and benefits, including without limitation, front pay, back pay, and severance pay, as well as psychological and emotional distress, and other financial loss caused by the unlawful actions of the defendants; (ii) punitive damages to deter such intentional or reckless deviations because the actions of defendants are outrageous, affect public policy, and also shock the conscience; and (iii) such other and further relief as this Court deems equitable and just.

## JURISDICTION

4.      Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and 1343 (a)(3) and (4), as this action seeks redress for the violation of Plaintiffs' civil rights.

5.      Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law and city administrative law claims that are so related to the federal claims that they form part of the same case or controversy.

6.      A copy of this complaint will be served upon the New York City Commission on Human Rights pursuant to Section 8-502(c) of the New York City Administrative Code.

## VENUE

7.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to plaintiffs' claims took place.

## JURY DEMAND

8.      Plaintiffs demand a trial by jury in this action on each and every one of their claims for which jury trial is legally available.

## THE PARTIES

9.      Plaintiff KEVIN SUTTON is an African-American citizen of the United States and the State of New York, and was at all times relevant to this complaint a resident of the Town of Newburgh, County of Orange, and State of New York. Mr. Sutton was employed by Mulligan from approximately May 2015 to December 2015.

10.      Plaintiff VINCENT DAVIS is an African-American citizen of the United States and the State of New York, and was at all times relevant to this complaint a resident of the City of New York, Bronx County, and State of New York. Mr. Davis was employed by Mulligan from approximately May 2015 to February 2016.

11.      Defendant MULLIGAN SECURITY CORPORATION ("Mulligan") is a private New York corporation engaged in the business of providing security services in the United States,

3

with its principal office in New York, New York. Mulligan maintains its principal office in Manhattan's Pennsylvania Plaza, which is located in this District. Mulligan is an employer within the meaning of applicable federal, state, and city statutes including, but not limited to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 and the Civil Rights Act of 1991, 42 U.S.C. § 1981, New York Executive Law, New York Civil Service Law, and New York City Administrative Code.

12.     Defendant BROOKFIELD PROPERTY PARTNERS, L.P. ("Brookfield"), as plaintiffs' joint employer, is a Delaware corporation principally engaged in the sale and investment of commercial property. Brookfield is licensed to conduct business in New York State under the entity name Brookfield Property Group LLC. Brookfield maintains a corporate office in Manhattan and is a publically traded entity on the New York Stock Exchange. Brookfield is an employer within the meaning of applicable federal, state, and city statutes including, but not limited to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 and the Civil Rights Act of 1991, 42 U.S.C. § 1981, New York Executive Law, New York Civil Service Law, and New York City Administrative Code.

13.     Defendant KIM MERTZ-SHEA was the Director of Security for Brookfield's New York Region at all times relevant herein. Upon information and belief, Defendant MERTZ-SHEA is currently employed by Brookfield.

14.     Defendant TOM BURKE was Mulligan's Director of Security at all times relevant herein. Upon information and belief, Defendant BURKE oversees the security services Mulligan provides to Brookfield's lower Manhattan properties. Upon information and belief, Defendant BURKE is currently employed by Mulligan.

15.     Defendant JOHN POLITOSKI was a Mulligan employee at all times relevant herein. Upon information and belief, Defendant POLITOSKI was the Supervisory Team Leader of the day shifts at Brookfield's lower Manhattan properties and was responsible for assigning the Tactical Response Officer post assignments. Upon information and belief, Defendant POLITOSKI is currently employed by Mulligan.

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION FILING

16.     Mr. Sutton filed a timely complaint with the Equal Employment Opportunity Commission ("EEOC"), charge number 520-2016-02319, on or about April 7, 2016.

17.     Mr. Davis filed a timely complaint with the EEOC, charge number 520-2016-02317, on or about April 7, 2016.

18.     The EEOC granted Mr. Sutton and Mr. Davis a notice of right to sue dated June 15, 2016.

19.     This complaint is filed within 90 days of Plaintiffs' receipt of the EEOC's Notice of Right to Sue.

## STATEMENT OF FACTS

***Background***

20.     Plaintiff, Kevin Sutton, is an African-American who served with the New York City Police Department ("NYPD") for 22 years, retiring in 2007 as Detective Second-Grade, an elite designation for the department's most senior and experienced investigators.

21.     Mr. Sutton served as a union delegate for 15 of his 22 years with the NYPD.

22.     Plaintiff, Vincent Davis, is an African-American who served with the NYPD as an undercover narcotics detective for nine years. Mr. Davis was forced to retire from the NYPD after sustaining an injury in his capacity as an undercover officer. He receives full retirement benefits and recognition.

23.     In December 2014, Mr. Sutton and Mr. Davis applied to Mulligan Security Corporation ("Mulligan") for the position of Tactical Response Officer ("TRO") at several Brookfield Property Partners, L.P. ("Brookfield") lower Manhattan properties.

24.     Upon information and belief, Brookfield contracted with Mulligan to provide armed security services at Brookfield's lower Manhattan properties.

25.     Upon information and belief, Brookfield and Mulligan are engaged in a joint employment of plaintiffs.

26.     Upon information and belief, Mulligan's Senior Level Executive Team is comprised exclusively of white males.

27.     Upon information and belief, Brookfield's New York Regional Security Leadership team is comprised entirely of white officials.

28.     Upon information and belief, Mulligan received approximately 150 applications for the TRO position at Brookfield's lower Manhattan properties.

29.     Upon information and belief, Mulligan hired approximately 25 part-time and full-time TROs to provide security at Brookfield's lower Manhattan properties.

30.     Upon information and belief, 23 of the TROs hired were retired NYPD officers, one TRO was an active duty NYPD officer, and one TRO was a retired New York City Department of Corrections officer.

31.     After the TROs were hired by Mulligan they were required to complete an intensive firearm training course.

32.     On or about May 1, 2015, Mr. Sutton and Mr. Davis were assigned to their shifts at Brookfield's lower Manhattan properties.

33.     Robert Salafia, at the time Mulligan's Executive Director of Operations, provided Mr. Sutton with a schedule accommodation allowing him to work Monday through Friday from 7 AM to 3 PM.

34.     Mr. Davis was assigned to work Tuesday through Saturday from 3 PM to 11 PM.

35.     Mr. Sutton and Mr. Davis began their assignment at Brookfield properties on May 4, 2015.

36.     At all times during the terms of Mr. Sutton's and Mr. Davis's respective employment with Mulligan, they were Mulligan employees within the meaning of the Civil Rights Act of 1964, as amended, New York Labor Law, New York State Human Rights Law, and New York City Human Rights Law.

37.     Mr. Sutton and Mr. Davis were frequently asked to work overtime assignments.

38.     Mr. Sutton and Mr. Davis accepted the overtime assignments whenever they were available to do so, with Mr. Sutton working approximately 18 overtime tours and Mr. Davis working approximately 6-10 overtime tours.

39.     Following one pay period, Mr. Davis noticed that he had not been compensated for an overtime assignment that he had worked.

40.     When Mr. Davis brought this to the attention of Mulligan's pay role department, he was told, in sum and substance, "let it go, it's a wash."

41.     Mr. Davis declined overtime assignments following this incident.

### *Racially Discriminatory Distribution of Holiday Bonuses*

42.     During the final pay period of December 2015, Mulligan sent out holiday bonuses to all of the TROs assigned to Brookfield's lower Manhattan properties.

43.     Upon information and belief, the holiday bonuses were based on performance reviews conducted by Defendant POLITOSKI.

44.     Upon information and belief, Mr. Sutton and Mr. Davis, the only fulltime African-American TROs employed by Mulligan and assigned to Brookfield properties and TRO Reggie Robinson, a full-time, half-white, half-African-American officer, received the three lowest holiday bonuses.

45.     Upon information and belief, part-time white, TROs employed by Mulligan and assigned to the Brookfield properties received higher holiday bonuses than Mr. Sutton and Mr. Davis.

***Racially Charged Comments About Mulligan Employees of Color***

46.     Defendant POLITOSKI referred to Mr. Davis as a "perp" to white Mulligan TROs assigned by Brookfield's lower Manhattan properties.

47.     "Perp" is a term commonly used by law enforcement officers to refer to people who have committed a crime.

48.     Upon information and belief, Defendant POLITOSKI did not refer to any white TROs as perps.

49.     Defendant POLITOSKI repeatedly stated to white TROs that Mr. Davis did not deserve to be a TRO, despite having the same background, training, and credentials as the other TROs employed by Mulligan and assigned to Brookfield properties.

50.     Upon information and belief, Defendant POLITOSKI never questioned the qualifications of the white TROs employed by Mulligan and assigned to Brookfield's lower Manhattan properties.

51.     Defendant POLITOSKI repeatedly told white TROs that they should not trust Mr. Davis.

52.     Upon information and belief, Defendant POLITOSKI never told TROs that they should not trust white TROs.

53.     On October 20, 2015, Mr. Sutton was included in a text message exchange with several coworkers, including Defendant POLITOSKI and Charles Neusch, another white TRO employed by Mulligan and assigned to Brookfield properties.[1]

54.     Writing in reference to Aaron, a Latino Mulligan employee, Defendant POLITOSKI wrote, "I am gong [sic] to get a gallon of gasoline and self conflagrate myself next time Aron [sic] repeats the same transmission 4 x in a row."

55.     Mr. Neusch responded, "Put it on him."

56.     Defendant POLITOSKI then wrote, "Any body [sic] have a lighter. That's it I'm getting the gas now."

57.     TRO Robinson responded to the text message between Defendant POLITOSKI and Mr. Neusch, "Hey, guys, I like Aaron, as I do pretty much everyone I work with, so either tell him what you feel and let him smack the shit out of you with one of those mits, or take it off line and share your feelings with those who are like minded… Thanks."

58.     Defendant POLITOSKI responded to TRO Robinson's text message, "Well… I was just kidding about the gasoline and all of that… Thought this was a safe place to have a little humor…"

59.     TRO Robinson responded, "Well, no, it's not safe for joking about setting fire to anyone. Enough said."

---

[1] Text message exchange attached as Exhibit 1.

60.     Later that day, Mr. Sutton showed Aaron the text messages.

61.     Aaron filed a complaint with Mulligan Human Resources about the text messages sent by Defendant POLITOSKI and Mr. Neutsch.

62.     Upon information and belief, Aaron told Mulligan Human Resources that he was concerned for his safety because of the text messages.

63.     Upon information and belief, Mulligan was required to file a report documenting the text messages with the NYPD because Aaron feared for his safety.

64.     Upon information and belief, a protective order against Defendant POLITOSKI and Mr. Neutsch should have also been issued because Aaron feared for his safety.

65.     Upon information and belief, Mulligan did not file a report with the NYPD documenting the text messages Defendant POLITOSKI and Mr. Neutsch sent.

66.     Defendant POLITOSKI and Mr. Neutsch were each suspended without pay for three days for the text messages about lighting Aaron on fire.

67.     Upon information and belief, after learning about the suspensions of Defendant POLITOSKI and Mr. Neutsch, Defendant MERTZ-SHEA shortened the suspension to one day and ordered an active investigation into who had shown Aaron the text messages.

68.     Upon information and belief, when Defendant POLITOSKI returned to work, Defendant BURKE assigned him to post one.

69.     Upon information and belief, Defendant MERTZ-SHEA intervened and told Defendant BURKE, in sum and substance, "POLITOSKI is not to work a post."

70.     Approximately 7 days after the text messages were sent, Mr. Sutton was approached by Defendant BURKE and asked if he had shown Aaron the text message from Defendant POLITOSKI and Mr. Neutsch.

71.     Defendant BURKE stated that Defendant MERTZ-SHEA ordered him to find out who showed Aaron the text messages.

72.     Mr. Sutton responded that several people were offended by the text messages of Defendant POLITOSKI and Mr. Neutsch and that any number of them could have shown Aaron the text messages.

73.     Mr. Sutton further stated that it is inappropriate to joke about lighting someone on fire and told Defendant BURKE, in sum and substance, "I guess minority lives don't matter."

74.     Mr. Sutton eventually told Defenadant BURKE that he had shown Aaron the text messages.

75.     Approximately three weeks after sending the text messages about lighting Aaron on fire, Defendant POLITOSKI was promoted to TRO Supervisor.

76.     Following this incident, Defendant MERTZ-SHEA stopped speaking to Mr. Sutton.

77.     Upon information and belief, several weeks after the text message incident, Defendant MERTZ-SHEA ordered Defendant BURKE to reject Mr. Sutton's scheduling accommodation in an effort to discourage his employment with Mulligan.

***Unequal Post Assignments***

78.     During Mr. Sutton's first 45 days of employment as a TRO at Brookfield's lower Manhattan properties, he was repeatedly assigned to the three least favorable posts.

79.     On or about June 4, 2015, Mr. Sutton spoke with Daniel Rice, Mulligan's Brookfield Account Manager, about his post assignments and issues he had with Defendant POLITOSKI.

80.     Upon information and belief, Defendant POLITOSKI was in charge of making the day shift post assignments.

81.     Mr. Rice told Mr. Sutton that he would look into the post assignments.

82.     Mr. Rice also stated that other TRO employees were having difficulties with Defendant POLITOSKI.

83.     Upon information and belief, Mr. Rice did not investigate Mr. Sutton's post assignment complaint.

84.     In late June 2015, Mr. Sutton spoke with Defendant POLITOSKI regarding his unfavorable post assignments.

85.     Defendant POLITOSKI reported his conversations with Mr. Sutton to Defendant BURKE, stating that he was "confronted" by Mr. Sutton.

86.     Defendant BURKE subsequently met with Mr. Sutton regarding the issues with his post assignments.

87.     Mr. Sutton explained to Defendant BURKE that at least three Brookfield posts were unfavorable because of various issues, including when the breaks were scheduled, when the meal times were scheduled, and various other issues with the areas the posts are designated to protect.

88.     Following Mr. Sutton's conversation with Mr. BURKE, his unfavorable post assignments occurred at a frequency similar to his white co-workers.

89.     From May 2015 through August, 2015, Mr. Davis was assigned to post one so often his co-workers nicknamed him "Post One."

90.     Post one is generally regarded as the least favorable post among TROs assigned to Brookfield's lower Manhattan properties.

91.     In July 2015, Mr. Davis sarcastically told his supervisors how much he enjoyed being assigned to post one and requested that post one be his permanent assignment.

92.     Upon information and belief, other second shift, white TROs have permanent post assignments.

93.     After requesting a permanent assignment at post one, Mr. Davis was rarely assigned to post one.

94.     Mr. Davis has been recognized for his outstanding work by employees of companies who rented properties with Brookfield, as well as Brookfield corporate employees while serving on post one.

***Selective Enforcement of Disciplinary Proceedings***

### A.  *Purchase/Consumption of Alcohol While In Uniform*

95.     On September 11, 2015, after Mr. Davis had completed his shift and had been relieved of his duty, he walked into a Rite Aid store located on a Brookfield property, purchased a twelve-pack of beer for a friend, and walked to the subway.

96.     Mr. Davis does not drink alcohol.

97.     On or about September 18, 2015, Mr. Davis's Mulligan and Brookfield supervisors filed a disciplinary notice falsely accusing him of walking through the Winter Garden, a Brookfield property, with a twelve-pack of beer.

98.     The disciplinary notice further stated that "the appearance of a uniformed TRO or security officer carrying beer and talking on a cell phone while in public on a Friday night is not the image that Brookfield wants associated with their brand or the TRO program."

99.     Upon information and belief, neither Mulligan nor Brookfield has a policy about purchasing alcohol on Brookfield properties while in uniform.

100.    Upon information and belief, the disciplinary notice was subsequently amended to state that Mr. Davis did not walk through the Winter Garden.

101.    Upon information and belief, several white TROs employed by Mulligan and assigned to Brookfield properties consume alcohol in bars on Brookfield properties while in their TRO uniform.

102.    Upon information and belief, Mulligan and/or Brookfield has not disciplined a white TRO for consuming and/or purchasing alcohol while in uniform on a Brookfield property.

### B.  Allegations of Leaving Post Early

103.    On December 5, 2015, Mr. Davis was working his post and received an order to respond to a potentially armed individual at an adjacent post.

104.    Mr. Davis responded to the call and left his post.

105.    No armed individuals were found and by the time the investigation concluded, Mr. Davis's shift was over and his post had been relieved.

106.    On December 9, 2015, Mr. Davis was falsely accused of leaving his post early on December 5th.

107.    Mr. Davis explained to Defendant BURKE that he did not leave his post early, but instead responded to a call about a potentially armed individual at a location outside of his post.

108.    Defendant BURKE stated in response, in sum and substance, "I hear you're always leaving early."

109.    Mr. Davis's supervisors repeatedly accused him of leaving his post early, but never provided any evidence documenting their accusations, despite the existence of multiple video surveillance cameras that recorded Mr. Davis's entire shift.

110.    Upon information and belief, Mulligan and/or Brookfield supervisors never made claims about white TROs leaving their post early.

### C.  Distributing Mulligan Training Pamphlets

14

111.    On September 11, 2015, while working his assigned post, which contained an area outside a Brookfield building, Mr. Sutton approached a Latino TRO who was also working a post that contained an outdoor area.

112.    TROs who are assigned to posts that contain an outdoor area are expected to patrol the outside and inside areas.

113.    Mr. Sutton handed the Latino TRO officer a pamphlet that Mulligan had distributed containing information about the Black Lives Matter movement.

114.    On September 14, 2015, Mr. Sutton was written up by Defendant BURKE, who, upon information and belief, was working under the instruction of an email sent by Defendant MERTZ-SHEA.

115.    Defendant BURKE told Mr. Sutton that Defendant MERTZ-SHEA wanted "paperwork generated" on Mr. Sutton.

116.    Upon information and belief, the Latino TRO that Mr. Sutton gave the Black Lives Matter pamphlet to was not written up for being outside.

### D.  Speaking with Other Brookfield Security Officers

117.    On or about January 12, 2016, Mr. Davis was told by a co-worker that the Mulligan and Brookfield supervisors ordered him to pull tapes of Mr. Davis while working his assigned posts.

118.    Mr. Davis' co-worker further stated that Mulligan and Brookfield supervisors were pulling two hours per day of surveillance video documenting Mr. Davis's shifts.

119.    Upon information and belief, the Mulligan and Brookfield supervisors were reviewing the surveillance tapes in order to find a basis to discipline Mr. Davis and terminate his employment.

15

120.   Upon information and belief, Mulligan and Brookfield supervisors did not request or review the surveillance tapes of white TROs.

121.   Upon information and belief, white TROs employed by Mulligan and posted at Brookfield properties had not been disciplined for other employment violations.[2]

122.   On or about January 14, 2016, Mr. Davis was approached by an unarmed Latino Brookfield security officer who was new to the job and began speaking to Mr. Davis.

123.   The conversation lasted approximately seven minutes.

124.   During Mulligan training TROs are encouraged to engage with their unarmed colleagues in an effort to improve the security services offered to the Brookfield properties.

125.   During Mulligan training TROs are told to mentor their unarmed colleagues in order to improve the security services offered to the Brookfield properties.

126.   On January 28, 2016, Mr. Davis received an Employment Disciplinary Notice from Defendant BURKE stating that he conducted a personal conversation while on duty on January 14, 2016.

127.   When Mr. Davis told Defendant BURKE that he didn't say anything to the officer that approached him, Defendant BURKE responded, in sum and substance, "You were listening."

128.   Mr. Davis's zone supervisor Paul Freitas, wrote on the Employment Disciplinary Notice "Let it be known Zone 2 Supervisor P. Freitas is very uncomfortable with this unwarranted action against TRO Davis."[3]

---

[2] *See* Exhibit 2, documenting a white TRO employed by Mulligan and assigned to Brookfield properties sitting and sleeping during his post, both violations of Mulligan's employee rules and regulations. Upon information and belief, this employee was not disciplined for his conduct despite supervisors from Brookfield and Mulligan knowing about the incident. In fact, Mulligan supervisors knew about the attached photo and ordered TROs who they believed possessed the photo to delete it.

[3] Employment Disciplinary Notice attached as Exhibit 3.

129.    Mr. Freitas resigned from his position with Mulligan one day later, upon information and belief, in protest over the disciplinary actions taken against Mr. Davis.

130.    Defendant BURKE told Mr. Davis that he was required to sign the disciplinary notice.

131.    Mr. Davis refused to sign the notice and was immediately suspended without pay.

132.    Upon information and belief, the Latino security officer who approached Mr. Davis did not face disciplinary action for speaking with Mr. Davis.

133.    On February 4, 2016, Mr. Davis was called to a meeting at Mulligan's corporate office in Manhattan, where he met with Mulligan's Senior Executive Team to discuss the disciplinary action.

134.    During the meeting Mulligan officials told Mr. Davis that he would be returned to work if he signed the disciplinary notice.

135.    Mr. Davis did not sign the disciplinary notice.

136.    Following the meeting, Defendant BURKE told Mr. Davis that Mulligan would contact him within 24 hours to discuss his employment status.

137.    Upon information and belief, Defendant MERTZ-SHEA was on vacation when the meeting between Mr. Davis and the Mulligan Senior Executive Team took place.

138.    Upon information and belief, when Defendant MERTZ-SHEA returned from her vacation she ordered Mulligan to fire Mr. Davis.

139.    Mr. Davis received a letter, by mail, dated February 18, 2016, stating that his employment was terminated effective immediately.

***Discriminatory Scheduling Practices***

140.    Upon information and belief, Defendant MERTZ-SHEA ordered Defendant BURKE to change Mr. Sutton's work schedule in retaliation for showing Aaron the text messages in which Defendant POLITOSKI and Mr. Neutsch stated that they were going to set fire to a Latino security guard.

141.    In December 2015, Defendant BURKE told Mr. Sutton would have to change his work schedule, stating that he would no longer be able to work Monday through Friday and would be required to work at least one weekend date.

142.    Mr. BURKE stated that Mr. Sutton would now be required to work Sunday through Wednesday and Friday and his regular days off would be Thursday and Saturday.

143.    Upon information and belief, no other fulltime Mulligan TRO assigned to Brookfield's lower Manhattan properties were given nonconsecutive days off.

144.    Mr. Sutton responded that he couldn't work weekends for personal reasons and his schedule accommodation had been a term of his employment upon his hiring.

145.    Mr. BURKE responded that if Mr. Sutton could not work weekends he would have to switch to part-time.

146.    Mr. BURKE further stated that only supervisors were permitted to work a Monday through Friday schedule.

147.    Upon information and belief, several white, non-supervisor TROs employed by Mulligan and assigned to Brookfield's lower Manhattan properties were given a Monday through Friday schedule.

148.     Approximately one month after Mr. Sutton was told that only supervisors could work a Monday through Friday schedule, a white, non-supervisor TRO requested to work a Monday through Friday schedule in an email message.[4]

149.     The white employee expressed his pessimism for being granted a Monday through Friday schedule, specifically citing the revocation of Mr. Sutton's schedule accommodation.

150.     The white Mulligan employee's request to work a Monday through Friday schedule was granted.

***Discriminatory Policies for Granting Vacation Day Requests***

151.     On or about December 1, 2015, Mr. Davis made a timely request to Anthony Beene, a Mulligan employee, to use vacation days on December 15 through December 19 in order to travel to South Carolina and tend to his sick mother.

152.     Mr. Davis was told Mr. Beene that his vacation request would have to be approved by Defendant BURKE.

153.     Upon information and belief, white TROs employed by Mulligan and working at Brookfield properties did not have to obtain Defendant BURKE's permission to use vacation days.

154.     Defendant BURKE denied Mr. Davis's request to use his vacation days.

155.     Upon information and belief, white TROs employed by Mulligan and working at Brookfield properties used vacation days between December 15th and December 19th, made notification that they would be taking their vacation days after Mr. Davis made his request, and were not required to obtain Defendant BURKE's permission to use their vacation days.

156.     Mr. Davis made subsequent requests to use his vacation days.

157.     All of Mr. Davis's vacation day requests were denied by Defendant BURKE.

---

[4] Email attached as Exhibit 4.

*Claims*

    A.  *Kevin Sutton*

158.    On December 18, 2015, Mr. Sutton resigned from his position as a result of Defendant BURKE no longer observing his Monday through Friday schedule accommodation.

159.    Mr. Sutton's resignation was a constructive discharge, as he was required to choose between his personal weekend obligations and working a nonconsecutive day off work schedule, which included weekend days, because of his race, amounting to a violation of his rights under federal, state, and city law.

160.    Defendants Mulligan and Brookfield created a hostile work environment for Mr. Sutton because of his race, amounting to unlawful racial discrimination under federal, state, and city law.

161.    Upon his resignation, Mr. Sutton requested reimbursement for unused vacation and sick days.

162.    Mr. Sutton was given five "bonus" vacation days for declining medical benefits and had accrued approximately nine vacation days at the time of his resignation, totaling 14 vacation days.

163.    Mr. Sutton had received two vacation days with pay prior to his resignation.

164.    Mulligan reimbursed Mr. Sutton for only two unused vacation days.

165.    Upon information and belief, Mulligan does not have a written vacation day forfeit policy.

166.    Mr. Sutton's hourly wage equates to approximately $35.00 per hour or approximately $280.00 per day.

167.    Mulligan therefore owes Mr. Sutton for unused vacation days and sick days.

*B.  Vincent Davis*

168.     In a letter dated February 18, 2016, Mr. Davis received a termination notice from Mulligan.

169.     Upon information and believe, Defendant MERTZ-SHEA ordered Mulligan to terminate Mr. Davis.

170.     Mr. Davis was unlawfully terminated because of his race, amounting to a violation of his rights under federal, state, and city law.

171.     Defendants Mulligan and Brookfield created a hostile work environment for Mr. Davis because of his race, amounting to unlawful racial discrimination under federal, state, and city law.

172.     Mr. Davis was reimbursed for only four unused vacation days.

173.     Upon information and belief, Mulligan does not have a written vacation day forfeit policy.

174.     Mr. Davis's hourly wage equates to approximately $35.00 per hour or approximately $280.00 per day.

175.     Mulligan therefore owes Mr. Davis for unused vacation days and sick days.

176.     Mr. Sutton and Mr. Davis have sustained economic and monetary loss and damages, injury to their name, reputation, and career, and have suffered embarrassment, humiliation, and shame from the conduct of defendants, in amounts to be proven at trial.

### FIRST CAUSE OF ACTION
**Discrimination and Retaliation**
**Pursuant to Title VII, 42 U.S.C. § 2000e** *et seq.*
(Against Defendants Mulligan and Brookfield)

177.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

178.    Defendants Brookfield's and Mulligan's acts of discrimination and retaliation constitute unlawful discriminatory practices within the meaning of 42 U.S.C. § 2000-e *et seq.*

179.    Defendants Brookfield and Mulligan have discriminated against plaintiffs due to their race.

180.    Defendants Brookfield and Mulligan have retaliated against plaintiffs because of their race.

181.    As a direct and proximate result, plaintiffs have suffered injuries and damages set forth above.

182.    Defendants Brookfield's and Mulligan's unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

183.    Plaintiffs have no adequate remedy at law and have suffered serious and irreparable harm to their rights under the Title VII of the Civil Rights Act of 1964.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1981 Discrimination Claims**

184.    Plaintiffs reallage and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

185.    Plaintiffs are African-American.

186.    Defendants intentionally discriminated against plaintiffs because of their race in the enjoyment, terms, and conditions of the employment relationship between Plaintiffs and Defendants in violation of Section 1981 of the Civil Rights Act of 1871, 42 U.S.C. § 1981.

187.    Defendants knew that their actions constituted unlawful discrimination on the basis of race and showed willful and/or reckless disregard for plaintiffs' statutorily protected rights.

188.    As a direct and proximate result of defendants' unlawful discrimination, plaintiffs have suffered, and will continue to suffer, irreparable injury, emotional distress, mental anguish,

physiological disorders, emotion distress, humiliation, monetary damages, and other compensable damages.

## THIRD CAUSE OF ACTION
**Discrimination and Retaliation Pursuant to**
**New York State Human Rights Law**
(Against all Defendants)

189.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

190.    Defendants' have discriminated against plaintiffs due to their race in violation of New York Human Rights Law, Executive Law § 296 *et seq.*.

191.    Upon information and belief, the individual defendants aided and abetted the discriminatory practices and acts alleged herein.

192.    As a direct and proximate result, plaintiff have suffered injuries and damages set forth above.

193.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

194.    Plaintiffs have no adequate remedy at law and have suffered serious and irreparable harm to their rights under the New York State Human Rights Law.

## FOURTH CAUSE OF ACTION
**Discrimination and Retaliation Pursuant to**
**New York City Human Rights Law**
(Against all Defendants)

195.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

196.    Defendants have discriminated against plaintiffs on account of their race in violation of New York City Human Rights Law, §8-101 of the New York City Administrative Code.

197.    Defendants have retaliated against plaintiffs as a result of their race in violation of New York City Human Rights Law, §8-101 of the New York City Administrative Code.

198.    Upon information and belief, the individual defendants aided and abetted the discriminatory practices and acts alleged herein.

199.    As a direct and proximate result, plaintiffs have suffered injuries and damages set forth above.

200.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

201.    Plaintiffs have no adequate remedy at law and have suffered serious and irreparable harm to their rights under the New York City Human Rights Law.

### FIFTH CAUSE OF ACTION
**Unpaid Wages Pursuant to New York State Labor Law § 190,** *et seq.*
(Against Defendant Mulligan)

202.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

203.    Defendants knowingly, willfully, and intentionally failed to compensate plaintiffs the applicable unused vacation day wages in violation of N.Y. Lab. Law § 198-c.

204.    Pursuant to N.Y. Labor Law § 198-c, an employer who willfully fails to pay wages for unused vacation days shall be liable for the amount of any unpaid vacation days.

205.    Because of defendants' willful violation of the N.Y. Lab. Law, plaintiffs are entitled to recover from defendants, jointly and severally, their unpaid vacation wages.

24

## DEMAND FOR RELIEF

**WHEREFORE**, plaintiffs demand the following relief against the defendants, jointly and severally:

(a)     compensatory damages for lost wages, including fringe benefits, back pay, and front pay, and also including, without limitation, benefits that would have otherwise been included in plaintiffs' retirement and/or pension plans, which resulted from the discriminatory acts and practices;

(b)     compensatory damages to compensate fully each plaintiff for emotional distress and other harm proved at trial;

(c)     punitive damages;

(d)     attorney's fees;

(e)     the costs and disbursements of this action;

(f)     interest; and

(g)     such other and further relief as this Court deems just and proper.

Dated: New York, New York
       September 12, 2016

                              BELDOCK LEVINE & HOFFMAN LLP
                              99 Park Avenue, PH/26 Floor
                              New York, New York 10016
                              (212) 490-0400


                              _____
                              Jonathan C. Moore
                              Keith Szczepanski

                              *Attorneys for Plaintiffs Kevin Sutton and
                              Vincent Davis*

# EXHIBIT 1



← **John Politoski, David...**   📞   ⋮

10/20/2015 10:02 AM


I am gong to get a gallon of gasoline and self conflagrate myself next time Aron repeats the same transmission 4 x in a row.

John Politoski


Put it on him

Charles Neusch


Any body have a lighter

John Politoski


That's it I'm getting the gas now

John Politoski

 |Type a message... 

← John Politoski, David… 📞 ⋮

Hey, guys, I like Aaron, as I do pretty much everyone I work with, so either tell him what you feel and let him smack the shit out of you with one of those mits, or take it off line and share your feelings with those who are like minded...Thanks.

10/20/2015 10:27 AM

Well... I was just kidding about the gasoline and all of that.He has been asked to limit him transmissions and cannot or will not. Thought this was a safe place to have a little humor but... Read direct



Type a message... 

 

← John Politoski, David... 📞 ⋮

with one of those thing, or take it off line and share your feelings with those who are like minded...Thanks.

10/20/2015 10:27 AM

Well... I was just kidding about the gasoline and all of that.He has been asked to limit him transmissions and cannot or will not. Thought this was a safe place to have a little humor but... Read direct 

 John Politoski

 Well, no, it's not safe for joking about setting fire to anyone. Enough said.

 Type a message... 

# EXHIBIT 2



# EXHIBIT 3

**MULLIGAN – EMPLOYEE DISCIPLINE NOTICE**

EMPLOYEE NAME _Vincent Davis_

INCIDENT-LOCATION _Upper Pavilion_

INCIDENT-DATE & TIME _1/28/16 1545_

SUPERVISOR _Paul Freitas_

TYPE OF VIOLATION:

| | | | | | |
|---|---|---|---|---|---|
| Appearance | | Unsatisfactory Work Quality | | Insubordination | |
| Attendance | | Violation of Rules and Regulations | | Failing Instructions | |
| Lateness or Early Quit | | Unprofessional Behavior | | Other | |

**SUPERVISOR / TOUR COMMANDER STATEMENT:**

As per Director Tom Burke Zone 2 Supervisor Paul Freitas was told to write up TRO V. Davis for white on Post 5/0 Medina was talking to TRO Davis for 7 minutes. Let it be know, Zone 2 Supervisor P. Freitas is very uncomfortable with this unwarranted Action Against TRO Davis

**EMPLOYEE STATEMENT:**

I have read this Mulligan – Employee Discipline Notice and understand it.

_____     _____     /     _____     1/28/16
Employee Signature          Date                          Supervisor Signature          Date

_Refused to Sign_

# EXHIBIT 4

# Gmail
by Google

**Kevin Suttton** 

---

## Fwd: Chris Condon
1 message

---

**turnkey08** <       >                                    Thu, Jan 7, 2016 at 7:47 AM
To: Sal Vanchieri TRO <                  >, Kevin Sutton TRO <                  >

Sent from my Verizon Wireless 4G LTE smartphone
-------- Original message --------
From: turnkey08 <                  >
Date: 1/7/2016 7:46 AM (GMT-05:00)
To: Tom Burke <                  >
Subject: Chris Condon

Good morning Mr Burke. Nice to have seen you yesterday hope 2016 is a good year for you and the family . Mr Burke I know we spoke few months back about in the event a Monday opened up 7x3. If one did you had said easier to rid my sat 7x3. I know Kevin left and I'm assuming an issue with him not working part of the weekend came up after his 8 months here . If with Chris Condon I heard this morning having to leave due to reasons, if his Monday, Tuesday or Wednesday 3x11 is available for a double for me and eliminate my 7x3 on Saturday is any possibility it would be greatly appreciated . I know it's a stretch but have to ask. Thank you for any consideration .
Sent from my Verizon Wireless 4G LTE smartphone